**SUNTRUST BANK, Central Florida, National Association, Plaintiffs,**

v.

**BLUE WATER FIBER LIMITED PARTNERSHIP, et. al., Defendants.**

No. 98–CV–73883–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 24, 2000.

788

Irwin M. Alterman, Kemp, Klein, Troy, MI, Daniel F. Berry, Wise & Marsac, Detroit, MI, James J. White, Ann Arbor, MI, for plaintiff.

Morley Witus, Barris, Sott, Detroit, MI, James J. Vlasic, Sommers, Schwartz, Southfield, MI, for defendants.

### ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WOODS, District Judge.

This matter having come before the Court on Magistrate Judge Steven D. Pepe's January 21, 2000, Report and Recommendation that Defendants' motion for summary judgment be DENIED [Document Nos. 32 & 42];

The Court having reviewed the pleadings submitted herein, including Magistrate Judge Pepe's January 21, 2000, Report and Recommendation, and there being no objections to the Report and Recommendation;

IT IS HEREBY ORDERED that this Court, upon review of all the relevant materials, ADOPTS the findings of fact and conclusions of law set forth in Magistrate Judge Pepe's January 21, 2000, Report and Recommendation as its own; and thus Defendants' motion for summary judgment shall be, and hereby is, DENIED.

Defendants Port Huron Fiber Corporation and E.B. Eddy Forest Products Ltd. filed a motion for summary judgment on Plaintiff's claims for tortious interference, breach of fiduciary duty, and to pierce Port Huron's corporate veil. This motion was filed contemporaneous to Plaintiff's motion for leave to file a first amended complaint. This Court thus referred Defendants' motion for summary judgment to Magistrate Judge Pepe for report and recommendation. Thereafter, Defendants Rust International Corporation (Delaware), RCC Fiber Company, Inc., and Rust International, Inc., filed a joinder, concurring in the relief that the moving Defendants' requested.

By Order dated January 21, 2000, Magistrate Judge Pepe granted Plaintiff leave to file a first amended complaint. None of the parties appealed this ruling. Also on January 21, 2000, Magistrate Judge Pepe issued a Report and Recommendation that Defendants' motion for summary judgment be denied, as Plaintiff is not collaterally estopped from raising its claims as a result of the bankruptcy court's March 9, 1999, valuation hearing. None of the parties filed objections to the January 21, 2000, Report and Recommendation. Because Magistrate Judge Pepe succinctly and sufficiently set forth the background, and the

parties do not dispute any portion of the Report and Recommendation, the Court finds it unnecessary to reiterate the facts here.

This Court furthermore declines to add any additional comment to the well-reasoned and extensive legal argument set forth by Magistrate Judge Pepe. Upon review of all the pertinent materials, this Court finds that Magistrate Judge Pepe correctly found that issue preclusion does not attach to Bankruptcy Judge Steven Rhode's 11 U.S.C. § 506(a) asset valuation decision. *See* Rep. & Recom. at 14–22. Logic dictates that if matters determined at the initial valuation are not binding at a later stage of the bankruptcy proceeding, they have no binding effect on a collateral proceeding before the district court. *See, e.g., In re Midway Partners*, 995 F.2d 490, 494 (4th Cir.), *cert. denied sub. nom.*, 510 U.S. 1010, 114 S.Ct. 599, 126 L.Ed.2d 564 (1993); *In re Snowshoe Co.*, 789 F.2d 1085, 1088–89 (4th Cir.1986); *In re Miller & Rhoads, Inc.*, 146 B.R. 950, 957 (Bankr. E.D.Va.1992).

Accordingly, for the reasons fully articulated in Magistrate Judge Pepe's January 21, 2000, Report and Recommendation, Defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' PORT HURON FIBER CORPORATION AND E.B. EDDY FOREST PRODUCTS, LTD. MOTION FOR SUMMARY JUDGMENT

PEPE, United States Magistrate Judge.

I. BACKGROUND FACTS

A. *The EPC Contract and Construction Bonds*

Blue Water Fiber Limited Partnership ("Blue Water") is a limited partnership that on March 1, 1994, entered into a contract, the Engineering Procurement and Construction Turnkey Contract ("EPC contract"), to design and build a pulp mill for the production of recycled paper. Blue Water's principal partners are RCC Fiber Company, Inc. ("RCC") and Port Huron Fiber Corporation ("Port Huron"), each of which are fifty percent owners. RCC is a wholly owned subsidiary of Rust International, Inc. ("Rust").[1] Port Huron is wholly owned by E.B. Eddy Paper, Inc. ("Eddy Paper"), which operates a paper mill in the Port Huron, Michigan, area next to the facility.

Rust received in excess of $66 million to design and construct this deinking plant, with the intended consumer of its product to be Eddy Paper. These funds were generated by Series 1994 bonds issued in the amount of $76,060,000.[2] The bonds were non-recourse bonds with respect to Port Huron and Rust. The plaintiffs, Suntrust Bank, Central Florida, and National Association, are the surrogate owners of these bond obligations.[3]

Pursuant to the EPC contract between Rust and Blue Water, Rust was to design and construct the facility to certain quality, performance and production standards. The deinking plant was completed in September 1995, and Eddy Paper, who owns the nearby paper mill, contended that the construction standards were not met. Various disputes arose between Rust, Eddy Paper and Blue Water which resulted in litigation and arbitration. Rust sued Blue Water, Port Huron Fiber and E.B.

---

1. Rust International has been renamed as Rust Engineering Construction, Inc.

2. Blue Water borrowed this money from the Michigan Strategic Fund pursuant to a Trust Indenture and Loan Agreement of March 1, 1994. The Strategic Fund issued Series 1994 bonds to provide this money. The Trust Indenture, which has currently been assigned to the Indenture Trustee, restricts Blue Water's ability to modify any of the Project Agreements without written consent of the Indenture Trustee or Bondholders.

3. The Bondholders acquired these bonds in 1997 for approximately $47 million.

Eddy Forest Products, Ltd.[4] in Alabama for $12 million alleging fraud, breach of contract and breach of fiduciary duties. The defendants counter-claimed. In August 1996, Port Huron Fiber and Eddy Forest filed a demand for arbitration with the American Arbitration Association under the terms of the Blue Water Fiber partnership agreement. Also in August 1996, Blue Water filed a separate demand for arbitration against Rust under the arbitration provisions of the EPC contract. In June 1997, Blue Water, Eddy Forest and Port Huron Fiber sued Rust and Raytheon (who had purchased certain Rust assets) in the St. Clair County Circuit Court for alleged fraudulent conveyance of the assets from Rust to Raytheon to avoid paying its debts.

## B. The Put Option

Under the EPC contract, if certain quality and production standards were not met, Blue Water had the option to require Rust: (1) to assume Blue Water's loan repayment obligations on the Loan Agreement; (2) to purchase the partnership interest of Port Huron; and (3) to indemnify it and Eddy with respect to any obligations under the Loan Agreement. (EPC contract, § 7.5, p. 28) (the "Put Option"). The EPC contract specified this Put Option, which required Rust to guarantee payment of the loan obligation, be exercised on or before January 1, 1998.

## C. Other Contracts

The Loan Agreement entered into between the Michigan Strategic Fund and Blue Water allowed amendments to the underlying project agreements only if they involved no "Material Adverse Effect" on either the company's ability to perform or "the liens or security interests of the Trustee in the Security under the Indenture." (March 1, 1994, Loan Agreement at

4, 35). A Trust Indenture was created the same date as the Loan Agreement between the Michigan Strategic Fund and the IBJ Schroder Bank & Trust Company, the initial Trustee for the Bondholders. It allowed an amendment to the guarantee or other agreements (including the project agreements) only if it would not prejudice the Trustee or the Bondholders or if it was approved in writing by the holders of a majority of the bonds outstanding indebtedness. (March 1, 1994, Trust Indenture, §§ 803–804 at 50). Blue Water also entered into a Guaranty Agreement with the Trustee of the Bondholders that also precluded amendment of the EPC contract in a material way—a manner that would have an adverse effect on the company's ability to carry out the agreement or on the liens and security interests of the Trustee. (Blue Water Guaranty at 2–3, 7–8). RCC, Rust, Port Huron and Eddy entities were not parties to these loan documents.

## D. The May 29, 1997, Exercise of the Put Option

Because the deinking plant allegedly failed to meet the production and quality standards set forth in the EPC contract, on May 29, 1997, Blue Water exercised the Put Option against Rust. It gave Rust as well as the Trustee the Put Election Notice.[5] Rust objected and asserted that the conditions precedent to its proper exercise had not been fulfilled. Rust did not appear at the closing to effectuate the transfer of ownership contemplated under the Put Option. The Bondholders, Blue Water and Eddy, failed in various efforts to restructure the debt in the summer of 1997.

## E. The Mediation and "Settlement"

On August 27 and 28 of 1997, a non-binding mediation between the original Bondholders, Blue Water, Rust and Eddy

---

4. "Eddy Forest" is an affiliate of Eddy Paper, which Plaintiff seeks to add as a defendant in this litigation in a First Amended Complaint. In a separate Memorandum Opinion and Order, this motion to amend is granted.

5. The general partner, Port Huron, exercised the Put Option on behalf of the Blue Water Fiber Limited Partnership.

occurred at the Boston law offices of Hale and Dorr, who were counsel for the Bondholders. William Webster acted as mediator.[6] At the end of the second day, a proposed settlement was reached by all parties, and its terms were set out in a written "Term Sheet." Plaintiff in this litigation contends that the Bondholders' representative expressly told the defendants that the proposed settlement was subject to final approval by the Bondholders. The Bondholders did not sign either the Term Sheet or any other later document that would release their rights against Rust to be paid on the bonds under the Put Option.

### F. The "Settlement" Among Blue Water, Rust, RCC Fiber, Port Huron Fiber and the Eddy Entities

A Settlement and Mutual General Release Agreement (the "Settlement Agreement") among Blue Water, RCC, Port Huron Fiber and the Eddy entities was drafted to incorporate the terms set out in the "Term Sheet" from the August 28, 1997, mediation. Under the Settlement Agreement, Rust would contribute $10 million for changes to the deinking plant, Port Huron and RCC Fiber were each to contribute $4.25 million "at the closing, if any, of a refinancing of the bonds,"[7] and if all litigation and disputes were settled, including all claims concerning Blue Water's exercise of the Put Option against Rust. The Bondholders never signed, initialed or gave their consent to this Settlement Agreement. They claim they never agreed to Rust avoiding its Put Option

obligations to assure payment on the bonds. While this Settlement Agreement was formally executed in April and/or May 1998, it states that it was entered into on August 28, 1997, according to the provisions of the "Term Sheet."[8] As noted above, the current Bondholders acquired their interest in the bonds at a substantially reduced cost in October 1997.

Blue Water failed to make the January and July 1998 loan payments on the bonds. On September 2, 1998, the Bondholders' trustee, Suntrust Bank, filed this action against Blue Water, E.B. Eddy Forest Products,[9] Port Huron, RCC Fiber and the Rust entities for payments under the bond or equivalent money damages.

In this 12–count complaint, only three counts allege wrongdoings by Port Huron and Eddy Forest. Only these counts are involved in the present summary judgment motion. Count X alleges that in settling their disputes with Blue Water and Rust (which let Rust out of its obligation, if any, to pay off the bonds), Port Huron and Eddy "tortiously interfered" with and caused Blue Water to breach its contract with the Bondholders. Count XI is a claim to "pierce Port Huron's corporate veil" in order to attribute Port Huron's alleged wrongdoings to its parent, Eddy. Count XII alleges that in settling their disputes, Port Huron and Eddy "breached fiduciary duties" to the Bondholders. In sum, the sole claims of the plaintiff Bondholders against Port Huron and Eddy relate to efforts made to restructure and increase the financing and to improve the deinking

---

6. Mr. Webster was formerly FBI Director and a United States district judge.

7. Because the Bondholders never consented to such a closing, this amount apparently has not been contributed. Port Huron has now lost its financial interest in the deinking plant, which has been resold to an entity that is currently in the control of the surrogate Bondholders.

8. At the hearing, counsel for the Bondholders asserted that it was not until December 1998 that the Bondholders first learned of the Set-

tlement Agreement that was derived from the August 28, 1997, Term Sheet.

9. E.B. Eddy Forest Products, Ltd. is by agreement of the parties not the appropriate defendant. The proper defendant is E.B. Eddy Paper, Inc., which is willing to be substituted. In a related motion seeking to amend the complaint, plaintiff wishes to add the correct Eddy party defendant and also add additional counts allegedly based upon more recently acquired information concerning the Settlement Agreement.

plant, which deprived the Bondholders of their alleged rights to be paid by Rust under the Put Option in the EPC contract.

In a proposed First Amended Complaint, plaintiff also wishes to assert that Blue Water, Rust, Port Huron and Eddy "conspired to induce Blue Water to breach contracts" and "conspired to deprive the Bondholders of a claim." As part of the Settlement Agreement, Rust's $10 million contribution was to be made by June 30, 1998. The full $10 million in improvements were not completed by June 30, 1998.[10] There is a dispute over the value of the improvements actually made to the project. At the hearing, defendant Rust claimed it had completed over $4 million in improvements and that an additional $4 million worth of projects had been identified.

### G. *The Bankruptcy Proceedings*

This case was temporarily stayed when the debtor Blue Water on September 24, 1998, sought Chapter 11 relief in our Bankruptcy Court. In connection with that proceeding, Blue Water filed a Motion to Value its assets that were pledged to secure its debt owed to the Indenture Trustee. These assets in which the Bondholders held a secured interest were the deinking plant and any value that flowed from the Put Option.[11] Bankruptcy Judge Steven Rhodes was to determine the value of these assets. A two-day hearing was held before Judge Rhodes, of which approximately one-half of a day was devoted to testimony on the valuation of the Put Option.[12]

On March 9, 1999, Judge Rhodes made a finding that the Put Option was not property of the debtor's estate because at the time the debtor filed for bankruptcy rights under this obligation had been released by the Settlement Agreement. Necessary to this finding is the legitimacy of the Settlement Agreement.[13] Alternatively, Judge

---

**10.** If circumstances dictated a later date, that date according to provisions of the Settlement Agreement could be no later than December 31, 1998, unless otherwise mutually agreed to by the parties.

**11.** Under a Security Agreement, also dated March 1, 1994, between Blue Water and the Indenture Trustee, the Indenture Trustee received, among other things, a security interest in all general intangibles which would include the "Project Agreements." This would include a security interest in the EPC contract and its Put Option. In the bankruptcy proceedings, the Indenture Trustee asserted that the Put Option was still valid and viable, and it had a security interest in it and its provisions to require Rust to pay the $76 million in bond obligations. In the alternative, if the Court found that there was a settlement, the Indenture Trustee argued that it was a fraudulent conveyance, and the settlement should be set aside because it was either a product of actual fraud to hinder the Indenture Trustee's collection of the debtor's obligation, or constructive fraud because it occurred when the debtor was insolvent, and the debtor, Blue Water, in receiving the $10 million in equipment pledged by Rust received far less consideration than the $76 million obligation under the bonds. (December 11, 1998, letter from Lawrence K. Snider of Mayer, Brown & Platt,

counsel for the Indenture Trustee to Bankruptcy Judge Steven W. Rhodes).

**12.** The first day was February 17, 1999, and the second day was February 24, 1999.

**13.** In the bankruptcy proceedings before Judge Rhodes, the Bondholders made several arguments attacking the legitimacy of the Settlement Agreement, all of which Judge Rhodes found unconvincing. First the Bondholders argued that the Blue Water–Rust–Eddy Settlement Agreement was an improper modification of assigned contract rights under Uniform Commercial Code § 9–318 and its counterpart § 338(1) of the Restatement (Second) of Contracts. These provisions allow a modification of assigned contract rights only if those rights were executory or unearned and if the modification is made in good faith and in accordance with reasonable commercial standards. The Bondholders argued that Blue Water's attempt to exercise the Put Option rendered the assigned contract rights "fully earned" and therefore not subject to modification. They argued in the alternative that if the right had not yet been executed, the modification that relinquished the rights under the Put Option was not made in good faith or in a commercially reasonably manner.

In the valuation hearing, Judge Rhodes noted that "the settlement did quite likely comply

Rhodes determined that even if the purported Settlement Agreement was not effective in releasing rights under the Put Option, it still added no value to the debtor's estate. Under the Put Option, Port Huron sold its interest in Blue Water to Rust, and Rust assumed Blue Water's loan repayments on the $76 million in bonds. The Court found that if the Put Option was properly exercised [14] in accordance with the terms of the EPC contract, there would be no economic value to Blue Wa-

ter's estate in Rust's purchase of Port Huron's interest in the partnership or in Rust assuming the obligations to pay the bond. This was because the debtor, Blue Water, received no value in Rust's purchase of Port Huron's interest in the partnership. Rust becoming a co-obligor under the bonds provided no value to Blue Water, which was also still obligated to pay those bonds, if not to the Indenture Trustee, then to Rust. If Rust was re-

with UCC § 9–318(2)." (Tr. of Tues., Mar. 9, 1999, Valuation Hearing at 23). In light of Rust's open disagreement over whether the conditions precedent to the exercise of the Put Option had been met and the substantial litigation related thereto, Judge Rhodes stated further that "it can hardly be concluded that [Blue Water's] rights were 'fully earned.' " *Id.* Judge Rhodes added that "the settlement did result from arm's length negotiation." *Id.* at 24. The settlement "required Rust to fund additional improvements to Debtor['s deinking facility] which Rust was not previously obligated to do, and which increased the deinking plant's efficiencies and which increased the value of the deinking plant to the direct benefit of the bondholders." *Id.* at 24. He reasoned further that in agreeing to this settlement, Port Huron made a choice to "stay in the deal" in exchange for Rust's commitment to additional funding and "[t]here was nothing here at all that was commercially unreasonable or lacking in good faith." *Id.*

Again, the bonds that were issued were non-recourse bonds. Judge Rhodes pointed out that "the bondholders lost nothing from the settlement they had before Port Huron caused the Debtor to attempt to exercise the put." *Id.* He added that the Bondholders, had they wanted an unconditional guarantee, should have negotiated for that from the beginning but failed to do so. He reasoned further that "their right to payments from the Debtor and to a secured claim in the deinking plant have not at all been impaired by this settlement. Indeed, the secured claim [in the mill] has been enhanced by the enhancements to the value of the deinking plant resulting from Rust's improvements and promises for further improvements." *Id.* at 24–25.

Judge Rhodes concluded that "the bondholders' interest in enforcing Rust's repayment obligation did not become so vested, as a matter of law in the circumstances, that it was beyond the ability of Port Huron and Rust and the Debtor to release the put." *Id.* at 25. He noted there was no written or

other agreement that would have prohibited the Debtor or Port Huron from settling and releasing the Put Option claim without receiving the consent of the Bondholders. Judge Rhodes noted that

the agreements provided and the lawyers subsequently exchanged appropriate language, agreeing that the parties' obligations would not be altered absent a signed writing. And on that basis, the indenture trustee may have a claim against Rust.

But there was no change whatsoever in the Debtor's obligations to the bondholders secured by the deinking plant.

*Id.* at 22–23. Thus, there was no violation of UCC § 9–318 or § 338 Restatement (Second) of Contracts.

He also found that "[t]he settlement was likely not a fraudulent conveyance" as the Bondholders asserted. *Id.* at 25. "In no realistic sense did the Debtor give away a $76 million claim for $10 million as the bondholders assert." *Id.* Judge Rhodes again pointed out that there was a substantial doubt whether the Debtor properly exercised the Put Option which would trigger Rust's obligations to repay the bonds. In addition, Blue Water did not give away $76 million of value because "the put was of no value to it." *Id.* at 25. Finally, Judge Rhodes noted that the Bondholders had no viable third party beneficiaries under MCLA § 600.1405 because ¶ 19.4 of the EPC contract limited this issue by stating that there were no "beneficiaries" other than that with a connection with the construction itself. *Id.* at 25. Judge Rhodes added that Rust's obligations were contingent only, and it had argued that the contingency had never been met. He found that the conditions that would make Rust obliged to a third-party beneficiary claim to the Bondholders had not been fulfilled because Rust had not undertaken the obligation to pay on the bonds. *See id.* at 26.

14. This question of the proper exercise of the Put Option is also involved in this case. No court has adjudicated whether or not the Put Option was properly exercised.

quired to pay the $76 million to the Bondholders, this did not provide the Indenture Trustee a larger secured claim than the claim that was secured by the bricks and mortar of the deinking plant.

In reaching his decision, the Bankruptcy Court acknowledged that if Rust, a solvent party, assumed the debt, this would have great value to the Bondholders because Rust would be liable to the Bondholders on this "contingent" guarantee of the $76 million loan. But that alone did "not make the bondholders' claim in this [bankruptcy] case a secured claim against the estate." *Id.* at 19. There was no value in the Put Option to the estate of the debtor. Any rights of the Bondholders against Rust under the Put Option or otherwise was a matter left to this District Court proceeding to determine in this litigation and was not a determination within the jurisdiction of the Bankruptcy Court. While not necessary to his determination, Judge Rhodes did state an opinion that the District Court would find in favor of the defendants with respect to the challenge of the Bondholders to the settlement process that led to the release of any Put Option obligations. *Id.* at 26–27.

## II. Defendants' Motion for Summary Judgment

Port Huron, joined by E.B. Eddy, moves for summary judgment on the plaintiff's claims for tortious interference, breach of fiduciary duty and piercing of the corporate veil of Port Huron. Defendants assert that the Blue Water–Rust–Eddy Settlement Agreement in 1998 supercedes and nullifies the EPC contract and any "Put Option" obligation. All of the plaintiff's claims in the current litigation on which defendants seek summary judgment relate to the Port Huron and Eddy Paper's actions that led to a nullification of the Put

Option.[15] Plaintiff also contends that there could be no Settlement Agreement involving the Put Option in which the Bondholders had a security interest without their consent or that of their Indenture Trustee.

Blue Water in its Chapter 11 proceedings moved under Bankruptcy Rule 3012 for valuation of the secured claims of its creditors under 11 U.S.C. § 506(a). In this case, the question as to whether the defendants improperly acted in entering into a settlement to extinguish and discharge rights under the Put Option is central to the plaintiff's claims. Yet defendant Port Huron contends that this issue as to the legitimacy of the Settlement Agreement and its effect on the Put Option was also involved in the valuation hearing before Bankruptcy Judge Rhodes. The Bondholders through their representative were involved in the Bankruptcy proceeding and represented by the law firm of Mayer, Brown and Platt in Chicago and Wise & Marsac of Detroit.

While the issue of the legitimacy and efficacy of the Settlement Agreement in extinguishing any rights under the Put Option is central to this litigation, defendants' motion for summary judgment does not seek to have that issue resolved in their favor directly on the merits. Rather, they say the issue has already been resolved by Judge Rhodes adverse to the Bondholders in the Bankruptcy proceeding, and the plaintiff in this case is precluded by collateral estoppel from challenging the prior negative determination against it on this issue. It is clear that in his opinion Judge Rhodes indicates that there was "nothing here at all that was commercially unreasonable or lacking in good faith" when Port Huron and Rust entered into a Settlement Agreement that

---

**15.** Again, these claims assert that Port Huron and the others who entered into the Settlement Agreement "tortiously interfered with" and caused Blue Water to violate its obligations to the Bondholders. Plaintiff also claims that Port Huron as a general partner breached its fiduciary duties to the Bondholders. Finally, Plaintiff asserts that Eddy should be held liable for the acts of Port Huron once Port Huron's corporate veil has been pierced.

brought in additional monies to try to fix the problems at the deinking plant and improve its efficiency (Tr. at 24). Defendant Port Huron contends that plaintiff is precluded from relitigating this issue under the doctrine of collateral estoppel, and accordingly defendants should be accorded summary judgment based upon the findings of Judge Rhodes.

The doctrine of collateral estoppel—now called "issue preclusion"—is that "a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

The general principle announced in numerous cases is that a right, question, or fact

> distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.

*Southern Pac. R.R. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897).

■ A party to a former litigation is precluded from relitigating an issue by collateral estoppel if: (1) there is a final and valid judgment affecting the same (or similarly situated) parties as appear in a second action; (2) the issue to be concluded is the same as that involved in the prior action; (3) the issue was raised, considered, and actually adjudicated in the prior action; (4) the issue was material and relevant to the disposition of the prior action; and (5) the resolution of that issue was essential to the judgment rendered (*i.e.*, not dictum). *Overseas Motors, Inc. v. Im-*

*port Motors Ltd.,* 375 F.Supp. 499, 510 (E.D.Mich.1974). *See also Detroit Police Officers Ass'n v. Young,* 824 F.2d 512, 515 (6th Cir.1987) (quoted in *United States v. Sandoz Pharm. Corp.,* 894 F.2d 825, 826–27 (6th Cir.), *cert. denied,* 498 U.S. 810, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990)); *Abbott Lab. v. Thermo Chem, Inc.,* 790 F.Supp. 135, 138 (W.D.Mich.1991).

■ Judge Rhodes in the Bankruptcy proceeding was responding to Blue Water's motion to value its assets that were pledged to secure its debt to the Indenture Trustee. In determining the extent to which the claim of the Indenture Trustee on the bond debt was secured under 11 U.S.C. § 506(a), Judge Rhodes sought to put a value on two assets in which the Indenture Trustee had a secured interest—the deinking plant and the Put Option. Plaintiff stresses that these valuation proceedings under Rule 3012 of the Bankruptcy Rules used for valuations were truncated. The Indenture Trustee was limited in the discovery it could have prior to the hearing, as well as the number of witnesses and testimony that could be presented during the hearing. This type of proceeding differs from a Rule 7001 adversary proceeding that is available if there is a challenge to the validity, priority or extent of the security interest. While the latter would have issue preclusive effect on fact questions decided, the former does not.

A valuation hearing under 11 U.S.C. § 506(a) is a limited purpose hearing necessary in order to further a bankruptcy proceeding. It is a tool allowing the bankruptcy court to put a dollar value on the Put Option litigation as part of Blue Water's estate in light of the asserted legal positions affecting it. Yet, this evaluation was done in connection with the Indenture Trustee's argument that its claim on the bonds is secured in part by the Put Option and rights related to it. The Rule 3012 hearing does not purport to be an adjudication on the merits of the litigation that

was being evaluated. It is well settled that "estimates of value made during bankruptcy proceedings are 'binding only for the purposes of the specific hearing and ... [do] not have a *res judicata* effect' in subsequent hearings." *In re Snowshoe Co.*, 789 F.2d 1085, 1088–89 (4th Cir.1986); *see also In re Midway Partners*, 995 F.2d 490, 494 (4th Cir.), *cert. denied*, 510 U.S. 1010, 114 S.Ct. 599, 126 L.Ed.2d 564 (1993).

Plaintiff challenges defendants to cite "a single case that holds that the bankruptcy court's use of such a summary proceeding can result in collateral estoppel." (Pl. Brief at 11). Defendants cite *In re Kouterick*, 161 B.R. 755 (Bankr.D.N.J.1993), that applied claims preclusion, or *res judicata*, from a confirmation order in a bankruptcy proceeding. Defendants urge that bankruptcy determinations should be given similar *issue preclusive* effect to factual findings in this Court.

*Kouterick* involved a post-confirmation challenge by Midlantic National Bank, the holder of a second and third mortgage, in a Chapter 13 proceeding. In an earlier Chapter 7 proceeding, the debtors had filed schedules indicating a residence was valued at $105,000. Midlantic offered an appraisal of $121,000 which would have been enough value to satisfy the unpaid $68,800 on the first mortgage and provide some payment on the $41,400 and $29,000 mortgages held by Midlantic. After the automatic stay was lifted, Midlantic filed a foreclosure complaint. The debtors filed a Chapter 13 plan the following month listing the residence's value at $70,000 due to the structural sagging of an entire floor of the house.

While the case involved some non-meritorious issues concerning the adequacy of notice to Midlantic's attorney, this $70,000 valuation was used to "cram down [Midlantic's two mortgages] to zero" and treat these debts as unsecured. *Id.* at 759. After receiving notice of the proposed plan, Midlantic did not appear at the confirmation hearing nor file objections to it. After

the November 1992 confirmation, Midlantic filed a complaint commencing an adversary proceeding to revoke the confirmation order based on alleged fraud of the debtors. The debtors filed a motion for summary judgment:

> The debtors' primary argument on these motions is that the doctrine of res judicata bars Midlantic from challenging the valuation by the debtors which was accepted at the confirmation hearing. Midlantic disagrees.

*Id.* The Court noted that "[u]nder § 1327, a confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation." *Id.* at 760 (quoting *In re Szostek*, 886 F.2d 1405 (3d Cir.1989)). The Court held that:

> Midlantic could have raised its objection to valuation and its claims of bad faith and fraud at or before the confirmation hearing, but it failed to do so. Under these circumstances, Midlantic's claims are barred by the doctrine of res judicata. *See also In re Jones*, 134 B.R. 274 (N.D.Ill.1991) and *In re Edwards*, 67 B.R. 1008 (Bankr.D.Conn.1986).

*Id.*

The Court would not undermine the finality of plan confirmations where a creditor with knowledge of alleged fraud did not object to confirmation of a plan that treated its mortgages as unsecured under 11 U.S.C. §§ 506(a), 1322(b)(2) and 1325(a)(4). Thus, the legal claim that Midlantic had a security interest in the property had been adjudicated between the parties and, absent some evidence of "fraud" discovered after the confirmation, Midlantic could not now raise a fraud claim that could have and should have been asserted at the confirmation hearing.

*Kouterick* dealt with claim preclusion regarding the claims of (1) whether the debts owed Midlantic were secured by the residence (actually decided in the prior litigation against Midlantic when its second mortgage was modified under 11 U.S.C. § 1322(b)(2)), and (2) whether the debtors

defrauded Midlantic and the Bankruptcy Court (a claim that could have been decided in the earlier proceeding). The *Kouterick* court did not rule under the doctrine of issue preclusion that the fact question that the residence was worth only $70,000 had been irrevocably established between the parties. Indeed, the court specifically disclaimed any issue preclusive effect of the § 506(a) valuation proceeding when Midlantic claimed that the debtors were precluded

> from using any valuation in this case other than the $121,000 appraisal on which Midlantic relied to obtain relief from the automatic stay in the chapter 7 case. This argument is without merit. Under Code section 506(a), valuation for one purpose in a case is not even binding for other papers [sic—"purposes"?] in the same case, let alone in subsequent cases.

*Kouterick,* 161 B.R. at 760.

For purposes of determining Chapter 11 priority, Judge Rhodes determined that the value of the Indenture Trustee's secured claim was $24.5 million, which basically was the value of the bricks and mortar of the deinking plant. He gave the Put Option a value of zero. A valuation order does nothing more than set out the amount of a creditor's secured claim for purposes of a Chapter 11 reorganization and does not constitute a full and fair adjudication of the facts. Indeed, Judge Rhodes clearly recognized the limits on his valuation determination throughout the proceedings. At that December 14, 1998, hearing on Debtor's Motion to Extend the Exclusive Period to File a Plan, he advised the Debtor and the Indenture Trustee that the court would have to value the litigation— the "contested and contingent claim" by an estimation, and that "in this court, estimations are done on a fairly summary basis." (Tr. at 24). He explained the basis for this abbreviated analysis of the claims, noting that

> if we take the path of attempting to actually determine, in a final judgment,

all of the very complex issues presented ... either here or in the district court, and with all subsequent appeals, before we have a confirmation here, it could be years. And the Chapter 11 process simply does not foresee that.

*Id.* at 24–25.

At the March 9, 1999, Ruling on Valuation Hearing, Judge Rhodes acknowledged the Bankruptcy Court's limited role:

> Now, it is not [the Bankruptcy] Court's place to determine who should or will prevail on the claims and defenses in the District Court. Nevertheless, this Court is required by this motion and our process to make a judgment about the value of the Indenture Trustee's secured claim.

(Tr. at 21).

As noted above, the Bankruptcy Court acknowledged that the Indenture Trustee asserted claims against Rust under the Put Option, which claims would be decided by this Court.

> In the original deal Rust entered upon a contingent guarantee. It may or may still be liable on that guarantee, and the District Court will decide that.
>
> \*      \*      \*      \*      \*      \*
>
> The Court concludes that the conditional guarantee may affect the bondholders' ... claim against Rust if the settlement is set aside....

*Id.* at 19–20.

Finally, at the October 19, 1999, Confirmation Hearing, Judge Rhodes clarified that the Valuation Order merely states that the amount of the Indenture Trustee's secured claim was $25.4 million. He reiterated that any decision made with respect to the validity of the purported Settlement Agreement was

> without prejudice to the arguments made by the bondholders or the indenture trustee that the [Settlement Agree-

ment] was not a valid contract in the first instance.

(Tr. at 79).

On several occasions in the bankruptcy proceedings efforts were made to obtain a third-party release of Eddy and Rust over the indebtedness to the Bondholders. These were rejected by the Bankruptcy Court or withdrawn by the Debtor. Judge Rhodes was adjudicating issues concerning the estate of Blue Water. He was not adjudicating claims between the plaintiff and defendants pending in this District Court. On the plaintiff's claim that the Settlement Agreement is not legitimate, it contends that it did not have a full and fair opportunity to litigate that issue in the Bankruptcy Court given the curtailment of discovery and presentation in the bankruptcy valuation proceeding.

Judge Rhodes made multiple disclaimers to his deciding the merits of those claims, although his dicta make it clear that he believes the defendants will prevail when the merits are decided. Yet, given these express disclaimers and the consistent case authority not giving issue preclusive effect to § 506(a) valuation determinations, this Court should not inflate Judge Rhodes' valuation determinations and his dicta on the likely outcome in this case to preclude the Indenture Trustee's ability to litigate that issue in this case. Judge Rhodes' analysis may well provide some light to this Court and the parties in the present proceeding, but as appealing as defendants Port Huron's and Eddy's arguments may be, Judge Rhodes' analysis cannot be made binding on the Indenture Trustee in these proceedings.

While often honored in its breach, courts should try to make the law more predictable. Indeed, the principles underlying both claim preclusion and issue preclusion serve this utilitarian goal. Yet, it is clearly established that the summary, limited purpose, § 506(a) valuation hearings have no issue preclusive effects no matter how final the former bankruptcy judgment. To deviate from this guideline whenever the

facts and short-term efficiencies recommend it does disservice to utility in the long run. Lengthy and expensive hearings in the second proceeding would be necessary to evaluate the totality of the circumstances surrounding the valuation proceeding and the fullness and fairness provided to the litigants. Yet, even greater inefficiencies and social harm would result in bankruptcy proceedings where creditors would feel compelled to struggle mightily against summary, limited purpose proceedings and to expand their procedural claims under Bankruptcy Rule 9014 to those approaching adversary proceedings out of fear that issue preclusion may later attach.

Understandably, Port Huron and Eddy feel they are the short-term victims of this long-term reasoning. They have lost their time and investment in efforts to establish and then resurrect an ill-fated deinking mill. They have paid attorneys to represent their interests in the bankruptcy proceedings. They feel they have been dragged into this case by vulture fund Bondholders seeking windfall profits on marginal theories of liability against Port Huron and Eddy attempting to establish "recourse" against them over Series 1994 bonds that were issued expressly without recourse against Port Huron.

If Judge Rhodes is correct on his evaluation that the Settlement Agreement was valid and the Put Option of no value even against Rust, the Port Huron and Eddy defendants may prevail on a motion for summary judgment. Yet, that motion must await further discovery and be made on the merits of the claims. Their current motion for summary judgment must be denied on the asserted ground of issue preclusion.

III.  RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that defendants' motion for summary judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); E.D.Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson,* 832 F.2d 950, 957–58 (6th Cir.1987); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Pursuant to E.D.Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

January 21, 2000.